# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3777 | **DATE** | 7/11/2002 |
| **CASE TITLE** | U.S., ex. rel., THOMAS JIMINEZ vs. DANNY JAIMET | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Jiminez's Petition for Habeas Corpus is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 1 2 2002 date docketed | |
| ✓ | Docketing to mail notices. | | 21 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| LG | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES ex. rel., <br> THOMAS JIMINEZ, | ) <br> ) <br> ) | **DOCKETED** <br> JUL 1 2 2002 |
| Petitioner, | ) <br> ) | |
| v. | ) <br> ) | No. 01 C 3777 |
| DANNY JAIMET, | ) <br> ) | Judge John W. Darrah |
| Respondent. | ) <br> ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner, Thomas Jiminez ("Jiminez"), seeks a writ of habeas corpus against the Sheridan Correctional Center Warden, Danny Jaimet, pursuant to 28 U.S.C. § 2254. Before the Court is Jiminez's Writ of Habeas Corpus in which he raises two grounds for relief: (1) ineffective assistance of appellate counsel for failing to "challenge the conviction itself" and (2) ineffective assistance of trial and appellate counsel for failing to object/appeal the police officers' perjured testimony.

The following summary of facts are drawn from the state court record, including the trial transcript, post-conviction pleadings, and materials submitted for purposes of appeal and post-conviction relief.

On or about October 5, 1995, two men, wearing nylon stockings over their face and each holding a gun, entered Armitage Liquor Store ("Armitage") in Chicago Illinois. Armitage contains both a liquor store and a bar. The men approached Orlando Perez ("Perez"), the manager of the establishment, and demanded money and Perez's jewelry. Perez gave one of the men his jewelry and $600 in cash. The men sought additional money from the safe. Perez was able to open one safe, which did not contain any additional money, and he could not open the second safe. Perez informed

the men that he had additional money in his car in the alley. One of the men ordered the patrons of the bar to go into the basement.

After the patrons were put in the basement, Perez and the two men went to the back exit of the bar. The back exit included a door and a separate metal security gate. When Perez opened the steel door, two police officers, who had been notified by a passerby of the bar that a robbery was taking place, were standing outside the door. The police officers stated that they were police officers, and ordered the men to drop their weapons. The men pointed their weapons at the police officers, and the officers fired upon the men. One of the men, Mark English ("English") was struck and fell to the floor. The other man ran down the hallway inside the bar, turning left into the bar area. After handcuffing Perez and English, one of the officers entered the bar area and found Jiminez on the floor with a gun shot wound. Jiminez and English were arrested, and the patrons were released from the basement.

Jiminez and English had a joint jury trial. Joseph Snal ("Snal") testified that he was across the street from Armitage on October 5, 1995, and observed two men, wearing ski masks, enter the store. Shortly thereafter, several police cars arrived at Armitage.

Jacqueline Espada ("Espada"), a patron of the bar on October 5, 1995, testified that she noticed two men, wearing ski masks and each holding a gun, enter the store. One of the men was tall and had a light complexion and held a "little machine gun". The other man was shorter and "darker" and held a "shiny handgun". The men stated to "hit the floor or I'm gonna start shooting". The patrons went to the floor. The men asked Perez for the keys to the safes and then ordered the patrons into the basement. In the basement, Espada heard a lot of screaming and gun shots.

Luis Santiago ("Santiago"), a patron of the bar on October 5, 1995, testified that two men

2

entered the bar wearing ski masks and carrying a gun. The men ordered the patrons to the floor and shortly thereafter ordered all of the patrons to go to the basement. Santiago testified that he noticed that Jiminez was seated at the bar when the two men came into the bar but did not remember seeing him in the basement.

Carmen Montanez ("Montanez"), a patron of the bar on October 5, 1995, testified that two men in dark clothing entered the establishment. One of the men was tall and white and carried an "uzi" type gun. The other man was short and dark and carried a chrome handgun. The short man ordered the patrons to get down on the ground. The men then took Perez to the office and asked him about the money. Then the men ordered the patrons into the basement. While in the basement. Montanez heard shouting and gunfire. Montanez also saw Jiminez in the bar at Armitage the night of October 5, 1995. She did not remember if he was still at the bar when the robbery took place. However, she testified that Jiminez was not in the basement with the other patrons during the robbery.

Perez testified that on October 5, 1995, he was the manager at Armitage. At about 11:00 p.m., two men entered the bar. One of the men wore a black hooded sweatshirt and "something" on his face and carried a gun. The man ordered Perez to the ground and removed Perez's jewelry. The man told Perez, "You know what we want"; and Perez handed the man $600 in cash from his pocket. The men picked Perez up and brought him to the office. In the office, Perez opened one of the safes, which was empty. Perez told the men that he did not know how to open the second safe, and he was hit in the head with a gun. Perez told the men that he had money outside.

The men took Perez toward the back door, where Perez unlocked the door. As Perez opened the door, with the men standing behind him, Perez heard shouting and then gunshots. After the

gunfire, Perez opened the security gate and let the police officers into the store.

Perez had seen Jiminez in the bar the evening of the robbery but did not know if he was present when the robbers entered the bar. Jiminez and Perez also shared an ambulance to the hospital.

Anthony Wojcik ("Wojcik"), a Chicago Police Detective, testified that he was informed a robbery was taking place at Armitage by an individual who observed the robbery taking place from outside the establishment. When he arrived at Armitage, the shutters on the front windows were closed. He and police officer Peter Masheimer ("Masheimer") went to the back of the building. Wojcik tried to open the back door, but it was locked. He went to a basement door and observed people in the basement. Wojcik informed Masheimer that there were hostages in the basement and to call for more police.

As Wojcik came from the outside basement stairs, he heard the back door of the bar start to open. When the door opened, Wojcik observed two men with ski masks, each pointing a gun at Perez. Wojcik yelled, "Police, drop your guns." Both men turned directly at Wojcik and Masheimer, pointing their guns at the officers. Wojcik then fired his weapon at the men. Wojcik observed Jiminez run down the hallway and turn left. After firing his weapon, Wojcik observed English fall at the end of the hallway inside the bar. Wojcik ordered Perez to open the gate as he reloaded his gun. He also observed English reaching for his gun while he laid on the floor. After English got his hand on the gun, Wojcik fired additional shots at English.

Wojcik handcuffed Perez, took English's gun, and handcuffed English. Wojcik walked through the hallway and entered the bar, where he observed Jiminez lying on his back. When he saw Jiminez, he recognized him as the man that had the small chrome pistol. Jiminez was also wearing

4

the same clothes as the man Wojcik saw when the back door was first opened. When Jiminez saw Wojcik, Jiminez stated, "Don't shoot, don't shoot; you got me." Wojcik quickly patted Jiminez down and dragged him to the back door. Wojcik learned that a chrome handgun was found under the bar and identified such gun as the weapon Jiminez had in his hands when the back door was opened.

Wojcik identified two nylon stockings as the ones worn by Jiminez and English and identified English and Jiminez during the trial as the two men involved in the robbery and shooting at Armitage. The identification was based on English's and Jiminez's clothing that was worn the night of the crime and their height, weight, and skin color. Wojcik also identified a photograph of the hallway leading from the back exit into the bar that contained a cut-piece of women's nylon, blood, and some keys on the floor.

Masheimer's testimony substantially corroborated Wojcik's testimony. Masheimer testified that he and Wojcik went to the back of Armitage to try to gain entrance into the establishment. Wojcik went down to an outside basement door and informed Masheimer that there were hostages in the basement and to call for more police. Masheimer heard the back door of the bar start to open. When the door opened, Masheimer observed Perez holding keys and two men in dark clothes wearing a mask over their face and holding guns. Masheimer yelled, "Police, drop the guns." The men turned and pointed their guns at the police officers. Masheimer fired his gun at the two men. Masheimer observed English on the floor reaching for his gun. English grabbed his gun and pointed it towards the officers; Wojcik then fired his gun at English.

Masheimer identified English and Jiminez during the trial as the men involved in the robbery and shooting at Armitage. The identification was based on English's and Jiminez's clothing that was

worn the night of the crime and their height, weight, and skin color.

John McMurray ("McMurray"), a Violent Crime Detective of the Chicago Police Department, testified that, on October 5, 1995, he was riding in a squad car with Wojcik. While driving, he observed two women having a conversation with two uniformed police officers. McMurray stopped the vehicle and overheard the women inform the detectives that they just observed a robbery taking place at Armitage. After arriving at Armitage, McMurray covered the front door of Armitage and a door that was on Kostner Avenue. While at the door, McMurray heard Wojcik shout, "Police, drop your weapons." After that, he heard several gunshots; he immediately called for more assistance. A few minutes later, Masheimer opened a door, and McMurray observed Jiminez and English in Masheimer's custody.

James Gilger ("Gilger"), a Chicago Police Officer, went to Armitage and was assigned to ride in the ambulance with Jiminez. Before leaving Armitage, Gilger observed his partner, Tom McIntyre ("McIntyre"), search Jiminez. When McIntyre searched Jiminez, he found a pair of dark blue gloves and cut-off panties from some nylons in his right pants pocket. Gilger identified the gloves, cut-off panties, and a hooded sweatshirt Jiminez wore on October 5, 1995, in court. Gilger testified that Perez was not in the same ambulance as Jiminez.

Thomas Finnelly ("Finnelly"), a Chicago Police Officer, testified that on October 5, 1995, he went to Armitage after two women informed him that they had observed a robbery taking place at Armitage. After arriving at Armitage, Finnelly heard "police, drop your guns" immediately followed by gunfire.

Juan Delgado "(Delgado"), who testified on behalf of Jiminez, testified that he was working at the register and as a bartender at Armitage on October 5, 1995. That evening, two men with ski

6

masks entered the bar and told Delgado to close the shutters on the windows. One of the men was a tall, muscular, white guy; and the other man was a short, black man. The men ordered the patrons and the workers into the basement. As Delgado was going toward the basement, he saw Jiminez crouch down between a dart machine and a jukebox.

On cross examination, Delgado admitted that he had learned that Jiminez had been charged with the crimes a couple of months before the trial, and he never contacted the police or the state's attorney to inform them that Jiminez was in the bar when the robbery took place.

Michael Mason ("Mason"), a Chicago Police Officer, testified that he spoke with Delgado at Area 5 Headquarters on October 5, 1995, after the robbery had occurred. At that time, Delgado told Mason that one of the men was approximately five-foot-six and had curly hair; he did not know the man's race. Delgado described the other man as a taller white or white/hispanic male. While talking with Delgado, Mason informed him of the names of the two individuals that had been arrested. Delgado did not inform Mason that Jiminez was in the bar when the robbers entered the bar.

During closing arguments, Jiminez's attorney argued that several of the witnesses' testimony supported the proposition that Jiminez was in the bar at the time that the robbers entered the bar and that Jiminez was not one of the robbers. In addition, Perez's testimony that he was in the ambulance with Jiminez contradicted Gilger's testimony that gloves and part of the nylons were found on Jiminez when he was searched in the ambulance.

The jury returned a verdict of guilty of armed robbery against Jiminez. Jiminez filed a Motion for a New Trial, making nine arguments:

> 1. The State failed to prove the Defendant guilty of the charge beyond

7

> all reasonable doubt.
> 2. The finding is against the weight of the evidence.
> 3. The Defendant was denied due process of law.
> 4. The Defendant was denied equal protection of the law.
> 5. The State failed to prove every material allegation of the offense beyond a reasonable doubt.
> 6. The Court erred in giving instructions on behalf of the State over Defendant's objection.
> 7. The Defendant did not receive a fair and impartial trial as guaranteed him under Article I, Sec. 2, 6, 8 and 10 of the Constitution of the State of Illinois and under the Fourteenth Amendment of the Constitution of the United States.
> 8. The Court erred in overruling the Defendant's motion for a directed verdict at the close of the State's case.
> 9. The finding is based upon evidentiary facts which do not exclude every hypotheses consistent with innocence of the Defendant.

On September 10, 1997, the trial court denied Jiminez's Motion for a New Trial. The trial court sentenced Jiminez to twenty years' imprisonment.

Jiminez filed an appeal with the First District Illinois Appellate Court. In his appeal, Jiminez argued that the "truth in sentencing" statute was unconstitutional. The Illinois Appellate Court affirmed Jiminez's conviction and sentence but ordered a re-calculation of Jiminez's sentence credit to reflect he was entitled to day-for-day good conduct credit.

On July 22, 1999, Jiminez filed a motion for an extension of time to file his petition for post-conviction relief. On August 3, 1999, the Circuit Court of Cook County denied Jiminez's motion for an extension of time to file his post-conviction relief petition.

On August 18, 1999, Jiminez filed a petition for post-conviction relief, alleging that the delay in filing his petition was not due to his culpable negligence. In the petition, Jiminez argued that appellate counsel was ineffective for failing to challenge his conviction because the evidence was closely balanced and because appellate counsel failed to raise an issue regarding the ineffectiveness

of trial counsel where counsel did not object to the use of perjured testimony in the State's case in chief. Specifically, Jiminez alleged that an officer's testimony that a nylon stocking was found in Jiminez's pocket was unbelievable. On August 26, 1999, the circuit court denied the post-conviction petition as being without merit.

Jiminez filed an appeal in the Illinois Appellate Court. Jiminez's appointed counsel filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987) (*Finley*), alleging that there were no issues of arguable merit. Jiminez filed a response, reiterating his previous two arguments. On July 21, 2000, the Illinois Appellate Court granted the *Finley* motion and affirmed the decision of the circuit court.

Jiminez filed a petition for leave to appeal to the Illinois Supreme Court, alleging the same two claims of ineffective assistance of counsel raised in his post-conviction petition. On November 29, 2000, the Illinois Supreme Court denied Jiminez's petition for leave to appeal.

On May 16, 2001, Jiminez filed the present petition.

A federal habeas court's role in reviewing state prisoner applications was modified by the Antiterrorism and Effective Death Penalty Act of 1996 to prevent "retrials" and to ensure that state court convictions are given effect to the extent possible under the law. *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000) (*Williams*). A federal court will not grant habeas corpus relief on any claim adjudicated on the merits by a state court unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A writ of habeas may issue under the "contrary to" clause if the state court applied a rule
9

different from the governing law set forth in the United States Supreme Court's cases or if the state court decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06. The court may issue a writ under the "unreasonable application" clause if the state court correctly identifies the governing legal principle of the United States Supreme Court but unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 407-08. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable; an unreasonable application is different than an incorrect application. *Williams*, 529 U.S. at 409-11.

In the instant case, Jiminez does not allege that the state court applied a rule different from the governing law set forth in the United States Supreme Court's cases or that the state court decided his case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. Accordingly, the Court must address Jiminez's claims under the "unreasonable application" clause, *i.e.*, whether the state court's adjudication of his claims involved an unreasonable application of the ineffective assistance of counsel standard under *Strickland v. Washington*, 466 U.S. 668 (1984) (*Strickland*). *See Roche v. Davis*, 291 F.3d 473, ___ (7th Cir. 2002).

To prevail on a claim of ineffective assistance of counsel, including both trial and appellate counsel, Jiminez must prove: (1) his counsel's representation was unreasonably deficient and (2) the deficient performance prejudiced him. *See Strickland*, 466 U.S. at 687-88. There is a strong presumption that counsel's conduct falls within the wide range of professional assistance and that the challenged action might be considered sound strategy. *See Strickland*, 466 U.S. at 689; *Winters v. Miller*, 274 F.3d 1161, 1166 (7th Cir. 2001).

As to claims of ineffective assistance of appellate counsel, performance is deemed insufficient when counsel omits a "significant and obvious issue" without a legitimate strategic reason for doing so. *See Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996) (*Mason*). Prejudice exists if the "omitted issue 'may have resulted in a reversal of the conviction or an order for a new trial'". *Mason*, 97 F.3d at 893, *quoting Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). Put another way, "performance is about picking the battles; prejudice looks at whether winning the battle would have a difference in the outcome of the war." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000).

Appellate counsel who files a merit brief need not, and should not, raise every nonfrivolous claim. Rather, appellate counsel should select from among the claims in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (*Smith*). While it is possible to bring a *Strickland* claim based on counsel's failure to raise a particular issue, it is difficult to demonstrate that counsel was incompetent. *Smith*, 528 U.S. at 288.

Jiminez argues that his appellate counsel was ineffective for failing to raise any issue contained in the post-trial Motion for New Trial. Jiminez does not identify which of the nine issues set out above appellate counsel should have raised but states that issues "challenging the conviction itself" should have been raised. Appellate counsel did appeal the constitutionality over the "truth in sentencing" on Jiminez's behalf and won that appeal.

The first, second, fifth, eighth, and ninth issues of the motion all pertain to allegations that there was insufficient evidence to convict Jiminez of armed robbery. Where a defendant challenges his conviction based on insufficient evidence, the reviewing court must consider all of the evidence in the light most favorable to the prosecution in determining whether any rational fact finder could

11

have found the essential elements of the crime beyond a reasonable doubt. *See People v. Gilliam*, 172 Ill. 2d 484, 515 (1996) (*Gilliam*). A conviction is not set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Gilliam*, 172 Ill. 2d at 515.

Jiminez argues that the case was "close" because the jury took several hours to deliberate, no witness in the bar recognized Jiminez as one of the offenders, and at least two witnesses testified that Jiminez was in the bar when the offenders entered the bar.

A person commits armed robbery when he violates 720 ILCS 5/18-1 while he carries on or about his person a dangerous weapon, including a firearm. 720 ILCS 5/18-2(a). A person violates 720 ILCS 5/18-1 when he takes property from a person by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-1.

The jury assesses the credibility of the witnesses, the weight of the evidence to be given to their testimony, and the inferences to be drawn from the evidence. *See Gilliam*, 172 Ill. 2d at 515. A jury is not required to accept any possible explanation with a defendant's innocence and elevate it to that of reasonable doubt. *See Gilliam*, 172 Ill. 2d at 516.

The time that it took the jury to deliberate does not lead to the conclusion that the evidence was close as to Jiminez's armed robbery charge. The jury in this case had to deliberate over multiple charges against two defendants. In addition, while none of the patrons of the bar recognized Jiminez, who wore a stocking over his head, the two police officers that saw and shot the two offenders positively identified Jiminez as one of the robbers. Furthermore, Jiminez's gun-shot injury and his proximity to the crime scene when arrested support the jury's verdict as did testimony that Jiminez told Officer Wojcik "you got me" and the testimony that gloves and a partial nylon stocking

was found on Jiminez's person. Lastly, the jury was not required to accept the two witnesses' testimony that Jiminez was in the bar at the time that the offenders entered the bar. In fact, Delgado's credibility and testimony that Jiminez was in the bar at the time the offenders entered the bar was impeached by Delgado's testimony that he had known Jiminez was charged with, and on trial for, the crime of armed robbery; yet, Delgado did not inform anyone prior to testifying that Jiminez could not have committed the crime because he was in the bar when the offenders entered. Considering all of the evidence in the light most favorable to the prosecution, a rational fact finder could have found the essential elements of armed robbery beyond a reasonable doubt.

Based on the above, Jiminez has failed to establish that his appellate counsel's failure to raise the issue that there was insufficient evidence to convict Jiminez of armed robbery was unreasonably deficient. Furthermore, even if the issue should have been raised, the above establishes that Jiminez has not established prejudice. The omission of this issue would not have resulted in a reversal of the conviction or an order for a new trial.

The fourth issue raised in the Motion for a New Trial alleged a denial of equal protection of the law. Jiminez does not allege any specifics as to how his equal protection rights under the law were violated. Furthermore, a review of the record does not demonstrate any questionable violation of Jiminez's equal protection rights that would support the need for appellate counsel to raise such an issue. Accordingly, Jiminez has failed to establish both requirements of the *Strickland* standard for this issue.

The fifth issue raised in the Motion for a New Trial was that the trial court erred in giving instructions on the State's behalf over Defendant's objection. The instructions at issue are not identified. The trial record does not indicate that any instructions on behalf of the State were given

over Defendant's objection. Accordingly, Jiminez has failed to establish both requirements of the *Strickland* standard for this issue.

The seventh issue raised in the Motion for a New Trial was that Jiminez did not receive a fair and impartial trial as guaranteed under both the Illinois and United States Constitution. The fourth issue raised in the Motion for a New Trial was the denial of due process. Jiminez does not specify any aspect of the trial that violated these constitutional rights except for his second ground for writ of habeas - ineffective assistance of trial and appellate counsel for failing to object/appeal the use of perjured testimony. Accordingly, this issue and the second ground for relief are addressed together.

The State's knowing use of perjured testimony to obtain a criminal conviction is contrary to fundamental principles of fairness and constitutes a violation of due process. *See People v. Jimerson*, 166 Ill. 2d 211, 223 (1995). Perjury in Illinois means materially false testimony made when known to be untrue. 10 ILCS 5/29-10; *People v. Laboy*, 227 Ill. App. 3d 654, 662 (1992) (*Laboy*). "[P]erjury does not deal with inconsistency; it deals with falsity." *Laboy*, 227 Ill. App. 3d at 662.

Jiminez argues that police witnesses committed perjury when they testified that they found a nylon stocking in his pocket because the testimony that Jiminez would have discarded the weapon after being shot but removed the nylon from his head and placed it in his pocket is "unreasonable and highly unlikely". First, testimony that might seem unlikely or unreasonable does not prove that such testimony was false. Second, the police officers did not testify that Jiminez took the nylon off his head and placed it into his pocket. The police officers identified a photograph that showed a piece of women's nylon on the floor in or near the hallway that Jiminez ran through. This nylon was

further identified in court as the nylon Jiminez wore during the robbery. In addition, there was testimony that cut-off panties from some nylons were found in Jiminez's pocket. The portion of women's nylon found in Jiminez's pocket was not argued as being the same piece of nylon that he wore during the robbery.

Jiminez also alleges that Perez's testimony that he was in the ambulance with Jiminez establishes that Gilger offered perjured testimony because Gilger testified that Perez was not in the same ambulance as Jiminez. Jiminez offers nothing else to demonstrate that Gilger's testimony was false. The conflict between Gilger's and Perez's testimony fails to establish that Gilger knowingly offered false testimony. *See Laboy*, 227 Ill. App. 3d at 186 (mere conflicts in testimony does not establish perjured testimony). Accordingly, it was not unreasonable for trial counsel not to object when the police officers testified in this regard. Furthermore, it was not unreasonable, and no prejudice arose, from appellate counsel's failure to raise this issue on appeal.

For the reasons stated above, Jiminez has failed to establish that the state court applied a rule different from the governing law set forth in the United States Supreme Court's cases or that the state court decided his case differently than the United States Supreme Court has done on a set of materially indistinguishable facts or that the state court's adjudication of his claims involved an unreasonable application of the ineffective assistance of counsel standard under *Strickland*. Jiminez's Petition for Habeas Corpus is denied.

Dated: July 11, 2002

JOHN W. DARRAH
United States District Judge

15